IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

UNITED STATES OF AMERICA,      )
                               )
            Plaintiff,         )
                               )
      v.                       )   Criminal Action No.
                               )   05-00344-01-CR-W-ODS
GARY EYE,                      )
                               )
            Defendant.         )

**REPORT AND RECOMMENDATION TO DENY
DEFENDANT'S MOTION TO DISMISS THE INDICTMENT
FOR VIOLATION OF THE ATTORNEY-CLIENT PRIVILEGE**

Before the court is defendant's motion to dismiss the indictment on the ground that calls from defendant to his attorney were recorded by CCA and distributed to the FBI, the United States Attorney's Office, and to counsel for defendant's wife. I find that defendant has failed to establish a Sixth Amendment violation of his right to effective assistance of counsel, he has failed to establish a Fifth Amendment Due Process violation, and he has waived any attorney-client privilege that may have existed in his phone calls to his attorney. Therefore, defendant's motion to dismiss the indictment, or in the alternative to suppress the evidence, should be denied.

*I.    BACKGROUND*

On September 29, 2005, an indictment was returned charging defendant with two counts of interference with federally protected activities, in violation of 18 U.S.C. § 245(b)(2)(B); one count of using or discharging a firearm during a crime of

violence, in violation of 18 U.S.C. § 924(c)(1)(A)(iii); two counts of using or discharging a firearm during a crime of violence causing murder, in violation of 18 U.S.C. §§ 924(c)(1)(A)(iii) and (j)(1); one count of tampering with a witness, in violation of 18 U.S.C. §§ 1512(a)(1)(C) and (a)(3)(A); one count of obstruction of justice, in violation of 18 U.S.C. § 1519; and one count of using fire to commit a felony, in violation of 18 U.S.C. § 844(h)(1). Co-defendant Steven Sandstrom was charged in all of these counts and with one count of threatening to retaliate against a federal witness, in violation of 18 U.S.C. § 1513(b)(2).

On October 24, 2007, defendant filed the instant motion to dismiss or, in the alternative, to suppress evidence seized during the recording of defendant's phone calls at CCA, on the ground that defendant's calls to his attorney were recorded (document number 246). On November 5, 2007, the government filed a response indicating that no one from the government listened to any part of the attorney-client calls, and the government was not aware that the attorney-client calls had been recorded until defense counsel notified the government.

I held a hearing on defendant's motion on December 3, 2007. Defendant was present, represented by John Osgood and Lance Sandage. The government was represented by David Ketchmark, Eric Gibson, and Michael Green.

The following witnesses testified:

1.    Special Agent Heith Janke, Federal Bureau of Investigation

2.    Special Agent Arch Gothard, Federal Bureau of Investigation

3.    Elise Marko, Financial Analyst with United States Attorney's Office

4.    Janine Shields, Mail Room Officer for CCA

5.    Kathy Clem, Mail Room employee at CCA

6.    Michael Crow, counsel for CCA

In addition, the following exhibits were admitted:

P. Ex. 1  AUSA David Ketchmark stipulation

P. Ex. 2  AUSA Michael Green stipulation

P. Ex. 3  DOJ Attorney Eric Gibson stipulation

P. Ex. 4  US Marshal letter

P. Ex. 5  Elsie Marko's notes on 1D2

P. Ex. 6  Elsie Marko's notes on 1D3

P. Ex. 7  Corrected transcript of attorney-client calls listened to by Elsie Marko

P. Ex. 8  Call log from CCA referencing calls from June 8, 2006, to August 1, 2006

P. Ex. 9  Call log from CCA referencing calls from August 1, 2006, to November 6, 2006

P. Ex. 16 Copy of grand jury subpoena and attachment

P. Ex. 17 Signature page from defendant's CCA Inmate Handbook signed by defendant indicating he received and read the handbook

P. Ex. 18 CCA's Inmate Handbook

P. Ex. 19 Notation of e-mail attachment sent from Elsie Marko to Special Agent Heith Janke with an attachment which is P. Ex. 6

P. Ex. 21 Alex McCauley stipulation

D. Ex. 1 Letter from John Osgood to Warden dated September 4, 2005

D. Ex. 3 Letter from John Osgood to Warden on September 12, 2007

D. Ex. 4 Letter from Warden to John Osgood

D. Ex. 5 E-mail dated September 17, 2007, from John Osgood to Mike Crow

D. Ex. 6 Letter dated September 19, 2007, from John Osgood to Warden

D. Ex. 7 E-mail to John Osgood with a copy of a letter Lance Sandage wrote asking for privatization

D. Ex. 8 Letter from David Ketchmark to John Osgood dated September 24, 2007

D. Ex. 9 Letter from Michael Crow to John Osgood dated October 3, 2007

D. Ex. 10 Letter from John Osgood to Michael Crow dated October 8, 2007

D. Ex. 11 Letter from Michael Crow to John Osgood dated October 12, 2007

D. Ex. 12 Letter from Michael Crow to David Ketchmark and John Osgood dated October 18, 2007

D. Ex. 13 Letter from David Ketchmark to court with copies to counsel dated November 15, 2007

D. Ex. 14 Letter from David Ketchmark to court with copies to counsel dated November 19, 2007

D. Ex. 15 Stipulation of John Osgood

D. Ex. 16 CCA's phone policy

4

D. Ex. 18 Photo copies of the disks provided by the government of Eye and Sandstrom recordings that included attorney client calls

D. Ex. 20 Letter to John Osgood from Michael Crow, outside counsel for CCA

## II. *FINDINGS OF FACT*

Based on the evidence presented at the hearing, I make the following findings of fact:

1.     The indictment returned on September 29, 2005, contained a count against defendant and co-defendant Steven Sandstrom alleging murder to prevent the victim from relaying information to law enforcement, and another count against Sandstrom for threatening to retaliate against a witness (Tr. at 8-9).  In addition, a criminal complaint was filed against Justin Buchanan which alleges that he threatened retaliation against a witness who was believed to be cooperating in the criminal case against defendant and Sandstrom with Sandstrom having initiated that threat (Tr. at 9).  Defendant was arrested and was detained without bond at the facility run by Corrections Corporation of America ("CCA") in Leavenworth, Kansas.

2.     When an inmate arrives at CCA, that inmate is assigned a personal identification number ("PIN") (Tr. at 127).  The PIN number gives each inmate access to the phone system (Tr. at 127). CCA records every phone call (Tr. at 128).  In order to isolate calls from an inmate, CCA uses the PIN number assigned to that inmate (Tr. at 128).

5

3.  The CCA Inmate Handbook states as follows:

Outgoing telephone calls.
(A)  You will be issued a PIN number during the intake
     booking process.
     (1)  Your PIN number is required to gain access to an
          outside line.
     (2)  Using another inmate's PIN number is not allowed
          and will result in disciplinary action.
(B)  Outgoing telephone calls may only be made collect or by
     phone card.
     (1)  Use of telephones will be on a first come, first
          serve basis.  Phone calls are limited to 30
          minutes.
     (2)  Three-way phone calls are not permitted.  If
          detected, your call will be terminated by the
          phone company and/or phone number blocked.
     (3)  Telephone conversations may be monitored and/or
          recorded for security reasons.

(Tr. at 129-130).

4.    Every inmate coming into CCA gets a copy of the CCA

Inmate Handbook (Tr. at 130).  The inmate has to sign an

acknowledgment of having received and read the handbook (Tr. at

130).  Defendant signed an acknowledgment indicating he had

received and read the inmate handbook (Tr. at 130-131; P. Ex.

17).

5.    When an inmate calls and someone answers, a recording

comes on that warns the recipient that the call is subject to

monitoring and recording (Tr. at 132).  About every five to ten

minutes during the call, the recorded voice will click in during

the conversation and repeat that the call is subject to

monitoring and recording (Tr. at 132).  On every phone at CCA is

a sign that warns that calls are subject to monitoring and

recording (Tr. at 133). If an inmate is in segregation, a roll phone is brought to the inmate and plugged into the wall (Tr. at 133). The phone has a cord long enough to reach all of the cells in segregation (Tr. at 133). The roll phone has a sign on it that says the calls are subject to monitoring and recording, and it gives instructions on how to use the phone (Tr. at 133).

6. On a daily basis, Janine Shields, Mail Room Officer for CCA, logs into the computer and clicks on live monitoring where she can see every inmate who is on the phone at that time (Tr. at 131). She clicks on and listens to the conversations as they are happening (Tr. at 131). In addition to spot checking phone conversations, Officer Shields is sometimes directed by the Chief of Security to watch a certain inmate and specifically listen to that inmate's telephone calls (Tr. at 131-132).

7. Specific numbers can be privatized, and in that case any calls to that number are not recorded (Tr. at 133-134). If Officer Shields clicks on the call to monitor it, she gets a message saying the call cannot be accessed (Tr. at 134). Numbers can also be temporarily blocked or permanently blocked (Tr. at 134). If Officer Shields privatizes a number, she has to put in the reason, the date, and who requested that the number be privatized (Tr. at 134). In order to have a number privatized, an attorney must provide a written request on his or her

7

letterhead[1] (Tr. at 147). The number would be privatized as to every inmate, not just as to the current client (Tr. at 147-148, 164). If the lawyer changes his or her phone number, CCA must be notified with a new privatization request for the new number (Tr. at 148).

8. In February 2006, agents spoke with Justin Buchanan who provided information suggesting that defendant may have been engaging in ongoing threats to have witnesses harmed while he was at CCA (Tr. at 9-10). Buchanan stated that defendant had asked him for $5,000 to have co-defendant Sandstrom killed (Tr. at 10). Defendant also said that he wanted Regennia Rios and Vincent DeLeon both killed (Tr. at 10). Defendant was to pay $15,000 for certain people to be killed and $6,000 for others to be killed, and Stephanie Eye was to make the payments[2] (Tr. at 41).

9. In approximately July 2006, an inmate at CCA named Eric Eymard contacted the FBI requesting that he be interviewed (Tr. at 11). Eymard was interviewed by the FBI on July 10, 2006, and

_____

[1]Shortly after the Eighth Circuit's decision in United States v. Hatcher, in 2003 (discussed below), John Osgood called the Chief of Security at CCA and stated that he did not want any attorney-client telephone calls recorded (D. Ex. 15). He was informed that a note would be made of this and his telephone calls would be excluded from recording (D. Ex. 15). Mr. Osgood was never informed that such a request had to be in writing (D. Ex. 15).

[2]Inmate Eric Eymard actually received $45 in wire transfers and his sister, mother, and someone in Texas received an additional $500 (Tr. at 41).

Case 4:05-cr-00344-ODS   Document 347   Filed 03/18/08   Page 8 of 31

on July 24, 2006 (Tr. at 11).  Eymard said that defendant was
asking for help in either killing witnesses or making sure they
did not show up for defendant's trial (Tr. at 12).  Eymard
indicated that defendant's fiancée at the time but who is now
defendant's wife, Stephanie Eye, was also involved (Tr. at 12).
Eymard said that defendant used the phone a lot at CCA (Tr. at
12).

        10.  Based on the charges in the original indictment dealing
with killing or harming witnesses, the information received from
Mr. Buchanan, and the information received from Mr. Eymard, the
FBI decided to open a collateral investigation surrounding the
alleged threats in which defendant was purportedly involved (Tr.
at 13).  The FBI prepared a subpoena directed at CCA requesting
all visitation logs from June 8, 2006, to the present as to
defendant and all telephone calls also since June 8, 2006, made
by defendant with the exception of calls to 816-525-8200 or any
other phone number deemed to be an attorney-client call (P. Ex.
16).  June 8, 2006, was chosen as the start date because that was
the day Eric Eymard was placed in segregation at CCA and is the
earliest date he would have had contact with defendant (Tr. at
14).

        11.  When CCA gets such a subpoena, Janine Shields looks up
the inmate's PIN and puts the PIN and the date parameters into
the computer (Tr. at 135).  CCA can hold about six to nine months

worth of phone calls before they are destroyed (Tr. at 135). If the inmate had made a call to a privatized number, the computer report would show that a call was made to that number, but the report would say the call was not recorded (Tr. at 135). At no time prior to the issuance of the subpoena did any lawyer for defendant Gary Eye request in writing to have his or her phone number privatized (Tr. at 136, 142).

12. Officer Shields received the subpoena for defendant's phone calls, and she gathered them using her computer and burned them to disks (Tr. at 137-138, 143). She gets about one hundred similar requests per year (Tr. at 138). When she burns the disks, she also prints off the call log which shows the numbers called and the dates of the calls (Tr. at 138). In order to exclude calls to a certain number when that number had not been privatized, Officer Shields would have had to go into her computer and individually click on each call that needed to be burned to a disk (Tr. at 142). There is no short-cut; unless the number has been privatized, the only way to exclude those calls from such a report would be to manually check every single call by the inmate before copying the calls to disks (Tr. at 143). Officer Shields does not listen to the calls when she copies them (Tr. at 144). No one at CCA listened to the calls in responding to the subpoena (Tr. at 144-145, 168). CCA does not keep copies of the disks or of the phone logs; CCA only keeps the subpoena

10

(Tr. at 145).  It took Officer Shields several hours to burn
disks of the calls because defendant made a lot of phone calls
and each disk holds only 3,000 minutes so she had to complete the
burns 3,000 minutes at a time (Tr. at 148).

13.  CCA has no subpoena from the U.S. Marshal's Service,
but Officer Shields remembers preparing disks for the Marshal
with respect to defendant Gary Eye (Tr. at 146).  She believes it
was the Marshal's Service because that is the only organization
that can get phone calls from CCA without a subpoena (Tr. at
150).  She believes it was in April or May of 2007 (Tr. at 147).
The disks sat on her desk for a month or two, and she told
Officer Clem (who fills in for Officer Shields in her absence)
that someone was supposed to come by to pick them up (Tr. at 147,
167).  When Officer Shields returned from vacation, the disks
were gone (Tr. at 147).  It is Officer Shields's recollection
that Officer Clem told her someone had come by to pick the disks
up (Tr. at 147).  United States Marshal for the Western District
of Missouri Mauri Sheer has no record of anyone from his office
requesting or receiving disks of defendant's phone calls, and he
contacted the Marshal's office in the District of Kansas and was
told that no one from that office requested or received disks
either (P. Ex. 4).  Officer Clem has no recollection of anyone
picking up disks while Officer Shields was on vacation (Tr. at
170).

11

14. That month, Elsie Marko with the U.S. Attorney's Office was assigned to assist with the Eye/Sandstrom case (Tr. at 72). She was told that there was going to be a large number of jail phone calls that she would need to listen to (Tr. at 72).

15. The subpoena was served on CCA on November 3, 2006 (Tr. at 15). CCA mailed a copy of six DVDs containing telephone calls and two call logs, and those were received by the FBI on November 9, 2006 (Tr. at 16). The DVDs contained a total of 26,000 minutes of telephone conversations (Tr. at 88). Each DVD received its own 1D number when logged into to the ELSUR[3] unit (Tr. at 16). 1D1 would not duplicate, so CCA mailed another which was received on November 27, 2006, and it was assigned the number 1D7 (Tr. at 17, 24). Work copies of the DVDs were made (Tr. at 17). When the DVD was inserted into a computer, a list of every phone call would come up on the computer screen (Tr. at 77). When you double click on a reference number, the call is played (Tr. at 77).

16. On November 29, 2006, before any of the DVDs were reviewed, a meeting was held between Special Agent Janke, Special Agent Gothard, and AUSA Michael Green to discuss privileges (Tr. at 18, 52). Although they were not expecting any attorney calls because the subpoena had stated that no calls to or from attorney

_____

[3]ELSUR refers to the electronic surveillance unit (Tr. at 49). The ELSUR unit maintains control and custody of all audio and video recordings (Tr. at 49).

Case 4:05-cr-00344-ODS   Document 347   Filed 03/18/08   Page 12 of 31

should be included, out of an abundance of caution the agents
were instructed to stop listening to a telephone call if they
came across one that was with an attorney (Tr. at 19, 53, 65).
The agents were instructed to draft a 302[4] noting the number, the
date they listened to the call, and the time when they stopped
listening to it (Tr. at 19, 53). Special Agent Janke is an
attorney, and he understands the ethical obligations placed on
attorneys with respect to attorney-client privileges (Tr. at 19).
No one was told to review attorney phone calls pursuant to a
crime-fraud exception (Tr. at 65).

17. In addition to the two special agents, Elsie Marko with
the United States Attorney's Office was to assist in reviewing
the DVDs (Tr. at 20). She met with AUSA Ketchmark on November
30, 2006, and he told her that if she came across a call
involving an attorney, she was to immediately stop listening to
it and to note at what point she stopped within the call (Tr. at
73-74, 97, 98, 116). She and the two agents were to begin in
different places so they were not all reviewing the same calls
(Tr. at 20). Ms. Marko began with 1D3 which covered calls from
July 11, 2006, through August 1, 2006 (Tr. at 20). In addition,
two other special agents, Jessica Branaman and Chris Sanders,
were to review some of the calls (Tr. at 21). They were

---

[4]An FBI 302 is a report generated by the FBI after a witness
is interviewed (Tr. at 49).

13

instructed not to listen to calls to or from attorneys (Tr. at 21, 65, 66-67). Special Agent Branaman did not wind up listening to any of the CCA calls (Tr. at 21). Instead, she listened to calls made from the Jackson County jail (Tr. at 22). Special Agent Sanders listened to calls on 1D2 and did minimize one or more calls (Tr. at 22).

18. Because of the amount of work on this and other cases, Special Agents Janke and Gothard relied almost solely on Ms. Marko's review of the phone calls (Tr. at 23, 54, 63). Special Agent Janke reviewed calls that were flagged by Ms. Marko as being potentially relevant, i.e., calls which contained conversation about the planning of threats or harming witnesses (Tr. at 24, 75). He also listened to a few calls from 1D7 which were around June 21, 2006 (Tr. at 25). None of the calls reviewed by Special Agent Janke were to or from an attorney (Tr. at 26). Special Agent Janke has never listened to any recorded call between defendant or co-defendant Sandstrom and an attorney (Tr. at 26-27). Special Agent Janke knows of no one with the government[5] who has listened to any calls between the defendants

---

[5]AUSA David Ketchmark has not listened to any of the recorded phone calls (P. Ex. 1). AUSA Mike Green has not listened to any of the recorded phone calls (P. Ex. 2). Eric Gibson, Department of Justice, has not listened to any of the recorded phone calls (P. Ex. 3). Mr. Ketchmark, Mr. Green, and Mr. Gibson were unaware that any attorney-client phone calls had been copied to the disks in compliance with the government subpoenas (P. Ex. 1; P. Ex. 2; P. Ex. 3).

and their attorneys (Tr. at 27). It is his belief that the only people who have listened to any part of those calls are Ms. Marko and Special Agent Sanders, both of whom stopped listening as soon as it was determined the conversation would include an attorney (Tr. at 27).

19. Special Agent Sanders reviewed 1D2, and the first call on the disk was to defense counsel John Osgood (Tr. at 34). Special Agent Sanders stopped listening to the call (Tr. at 34-35). Ms. Marko also listened to the 1D2 disk (Tr. at 40). This was because Agent Sanders was abruptly transferred to Quantico (Tr. at 43).

20. Special Agents Janke and Gothard were not aware that any attorney calls were on those disks until defense counsel called the prosecutor in September of 2007 after receiving a copy of the disks (Tr. at 38, 54). During the nine months between the receipt of the disks and that call, Ms. Marko was the one listening to the calls (Tr. at 38, 64). She did not discuss with the agents that there were attorney calls on the disks and that she was minimizing them, because she was not instructed to report back to them every time she minimized a call (Tr. at 38, 43, 116). Rather, she was providing them with what she deemed to be relevant calls as well as a log or summary of her review of the calls (Tr. at 43, 53-54, 63-64). She may have pointed out to them certain calls she thought were relevant and should be

15

transcribed (Tr. at 115).  The summaries were provided to Special
Agent Janke once Ms. Marko's review of each disk was complete
(Tr. at 119, 173-174).

21.  Ms. Marko's summaries included the i.d. number of each
call, the length of the call according to the disk, her summary
of the call, and her opinion as to its relevance (Tr. at 78).
She divided relevance into three categories:  calls relevant to
the threat investigation, calls irrelevant to the threat
investigation, and attorney-client calls (Tr. at 80).  She did
not talk to any Assistant United States Attorney about listening
to parts of attorney conversations (Tr. at 87).  She just
minimized as directed and made a note of it in her summaries (Tr.
at 87).  Although the lengthy identification number for each call
included the telephone number called, Ms. Marko did not pay
attention to that because it was more time consuming to separate
out the phone number than to begin the call and stop listening if
it was an attorney call (Tr. at 89, 105).  With 26,000 minutes of
calls to review, time was of the essence and she went from one
call to the next when reviewing the calls on the DVDs (Tr. at 89,
105).  She had not been instructed to filter out calls by the
identification number, she had been instructed to stop listening
if the call included an attorney (Tr. at 105-106).

22.  During her review of 1D2 and 1D3, Ms. Marko came across
seven calls to an attorney, and she minimized those calls (Tr. at

16

80).  As soon as she realized an attorney was on a call[6], she stopped listening (Tr. at 87).  Sometime around late August or September 2007, AUSA Ketchmark asked Ms. Marko if she had come across any calls to attorneys in her review of the DVDs, and she told him she had but that she had employed the minimizing techniques as she had been instructed (Tr. at 90, 91, 106).  Ms. Marko was instructed through a court order entered on November 14, 2007, to provide a transcriptionist with the DVDs, and the transcriptionist transcribed the calls up to the point where Ms. Marko indicated she had stopped listening (Tr. at 82; doc. #252).  After the transcripts were prepared, Ms. Marko reviewed them and discovered that a couple of the calls had been transcribed a few words beyond where she had stopped listening[7] (Tr. at 83).  The transcript was corrected and was filed with the court (Tr. at 83-

---

[6]Ms. Marko testified that the calls started out with a recording, "Hello, this is a collect call from" and then the defendant would say his name (Tr. at 103).  On some calls, he said, "It's me, baby," or "It's Gary," or "Pick up the phone, honey" (Tr. at 103).  On the call to Mr. Osgood's office, he said, "Gary Eye" (Tr. at 103).  Next is another recorded message, "This is a call from a person at the Correctional Facility.  To accept charges, press zero.  This call is subject to monitoring and recording.  Thank you for using Evercom." (P. Ex. 7, page 1).  On calls where the call was answered, "Law Office", the reason the call is transcribed beyond that point was that it took a second or two for Ms. Marko to use her mouse to click and stop the call (Tr. at 107).  She was typing notes of each call as she listened to it, and had to move her hand from the keyboard to the mouse (Tr. at 109-110).

[7]Ms. Marko determined this by putting the disks in her computer, listening to the point where she had marked she stopped, and compared that to the transcripts (Tr. at 108-109).

84; P. Ex. 7). None of the calls heard by Ms. Marko included any conversation other than defendant asking for John Osgood, except on one call Mr. Osgood asked defendant how he was doing and defendant said "fine" (P. Ex. 7). The transcriptionist instructed Ms. Marko to destroy the original transcripts that went beyond where she had listened, so she did (Tr. at 107).

23. Special Agent Gothard had not listened to any of the recorded phone calls prior to the time Mr. Osgood notified the government in September 2007 that attorney calls had been recorded (Tr. at 55). Special Agent Gothard has not listened to any calls provided by CCA that were to or from an attorney (Tr. at 55-56). It is Special Agent Gothard's belief that no person associated with the government has listened to the substantive part of any conversation involving an attorney (Tr. at 56).

24. The United States Attorneys Office had given copies of the recorded phone calls to Alex McCauley, an attorney representing Stephanie Eye (Tr. at 39). Mr. McCauley was appointed to represent Ms. Eye after she received a target letter (Tr. at 44; P. Ex. 21). Mr. McCauley was originally to get DVDs of only the calls relevant to his client, but because it would be very cumbersome to duplicate the disks in that manner, the disks were simply copied in their entirety and Mr. McCauley was directed to the relevant calls (Tr. at 44, 92-93). Ms. Marko was instructed to duplicate the disks, and she did that (Tr. at 113-

18

115, 117).  She did not know how to isolate certain calls by transferring them to a hard drive, and she was not instructed to copy the disks that way (Tr. at 114-115).  The calls were played for Mr. McCauley in Ms. Marko's office (Tr. at 93).  Special Agent Gothard told Mr. McCauley that this was a sensitive investigation and the disks were the property of the government (Tr. at 93).  This meeting with Mr. McCauley happened after Mr. Osgood had notified the United States Attorney's Office that privileged calls appeared on his disks (Tr. at 175-176). Although AUSA Ketchmark was aware that attorney-client calls had been recorded, he was not aware that those calls were on the disks given to Mr. McCauley (Tr. at 176).  Mr. McCauley began to listen to a call but recognized the voice of John Osgood (P. Ex. 21).  He stopped listening to the call, skipped all other calls with that number in the identifier, and notified Mr. Osgood that the attorney-client call was in his possession (P. Ex. 21).  Mr. McCauley has no recollection of the substance of the one call he did listen to (P. Ex. 21).

25.  When Ms. Marko reviewed other disks, she only opened calls with Stephanie Eye's phone number in the identification number, so she did not run across any more attorney conversations on other disks (Tr. at 95).  By this time, she had memorized the phone numbers to lawyers and looked for them in the

identification number (Tr. at 96). If those numbers appeared, she did not open the call (Tr. at 96-97).

### III. MOTION TO DISMISS

Defendant argues this his Fifth Amendment due process rights and his Sixth Amendment right to counsel have been violated as a result of the phone calls to his attorney having been recorded by CCA.

### A. EFFECT OF OVERHEARD CONVERSATIONS

Defendant argues that the indictment should be dismissed[8] or, in the alternative, that the evidence obtained through recorded phone calls at CCA should be suppressed because his conversations with his attorney were recorded by CCA and turned over to the FBI.

More than four decades ago, the United States Supreme Court denied a petition for certiorari in Black v. United States, 385 U.S. 26 (1966), a case which initiated a belief among some that when attorney-client conversations are recorded and presented to the government, a reversal of any conviction is appropriate. In Black, the Supreme Court was made aware after the petition for certiorari had been denied but before an application for rehearing had been filed that FBI agents installed a listening device in Black's hotel on a matter unrelated to his current

_____

[8]Defendant has cited no case which held that dismissal of an indictment is an appropriate remedy even where a constitutional violation is found to have occurred.

Case 4:05-cr-00344-ODS   Document 347   Filed 03/18/08   Page 20 of 31

case. They intercepted conversations between Black and his attorney, but those conversations were unrelated to his pending tax evasion case. The FBI made reports and memoranda of the attorney-client conversations and those were examined by the Tax Division attorneys prior to trial. The Tax Division attorneys found nothing in the FBI reports which they considered relevant to the tax evasion case. However, the Solicitor General suggested to the Supreme Court that the tax evasion conviction be vacated and remanded to the district court where the materials could be reviewed. The Supreme Court wrote:

> [U]nder the circumstances presented by the Solicitor General in this case we believe that a new trial must be held. This will give the parties an opportunity to present the relevant evidence and permit the trial judge to decide the questions involved. It will also permit the removal of any doubt as to Black's receiving a fair trial with full consideration being given to the new evidence reported to us by the Solicitor General.

The following year, the Supreme Court vacated a conviction against Charles O'Brien and remanded for a new trial, all without explanation. O'Brien v. United States, 386 U.S. 345 (1967). Justice Harlan, dissenting, outlined the history of the case. The FBI installed a microphone in a commercial establishment owned by an acquaintance of O'Brien. At one point, O'Brien was overheard by the FBI asking his attorney to file an application relating to the territorial conditions of his release on bond. The FBI did not provide any reports or summaries of this call to the government attorneys; however, the Solicitor General, in

21

notifying the Supreme Court of the overheard attorney-client conversation, stated that he would "not oppose" a remand of the case for an adversary hearing as to the effect of this activity on the validity of the conviction. Justice Harlan wrote:

> As I stated in dissenting from a similar disposition in Black v. United States, 385 U.S. 26, "I agree, of course, that petitioner is entitled to a full-scale development of the facts, but I can see no valid reason why this unimpeached conviction should be vacated at this stage. . . . [A] new trial is not an appropriate vehicle for sorting out the eavesdropping issue because until it is determined that such occurrence vitiated the original conviction no basis for a retrial exists. The Court's action puts the cart before the horse."

> In Black, the Court's disposition might conceivably be accounted for by the fact that the Government admitted that the contents of the recorded conversation had been incorporated in memoranda used by the prosecuting attorneys. In the present case, however, I can think of no justification for going beyond the position of the Solicitor General and forcing the Government to go through the effort and expense of an entirely new trial on the basis of this peripheral, totally insignificant, and uncommunicated eavesdropping.

A decade later, the Supreme Court was presented with a similar issue in Weatherford v. Bursey, 429 U.S. 545 (1977). In that case, Bursey filed a § 1983 action against Weatherford, an undercover agent. Bursey and Weatherford, in his undercover capacity, had vandalized the offices of the Selective Service. Police were advised of the incident by Weatherford who was arrested along with Bursey to protect his undercover status. Both were released on bond and hired attorneys. Bursey and his attorney requested Weatherford attend two meetings, which he did,

Case 4:05-cr-00344-ODS   Document 347   Filed 03/18/08   Page 22 of 31

and the approaching trial was discussed. Weatherford had told Bursey that his attorney was going to request a severance, and neither Bursey nor his attorney questioned that move. At no time did Bursey or his attorney ask Weatherford if he was an informer. At no time did Weatherford relay the substance of these meetings to his superiors or to the prosecuting attorneys.

The government had not planned to call Weatherford as a witness so he could continue his undercover activities. However, shortly before the trial, he was seen in the company of police officers. Because his undercover status was compromised, the government decided at the last minute to call him as a witness. Weatherford testified about the vandalizing incident, but not about anything that was said during the attorney-client meetings he attended. Bursey was convicted.

Bursey filed a § 1983 action against Weatherford alleging that Weatherford violated Bursey's Sixth Amendment right to counsel and his Due Process right to a fair trial. The district court found for the defendants, but the Fourth Circuit Court of Appeals reversed, holding that "[W]henever the prosecution knowingly arranges and permits intrusion into the attorney-client relationship the right to counsel is sufficiently endangered to require reversal and a new trial." The court thought Weatherford was himself a member of the prosecution and that therefore it was also immaterial that he had not informed other officials about

23

what was said or done in the two meetings with Bursey and his attorney. The court of appeals relied on the "per se rule" established in Black v. United States and O'Brien v. United States.

The Supreme Court reversed, apparently perplexed that the court of appeals would read a per se rule finding a violation of the Sixth Amendment and the Due Process clause when neither of those Constitutional provisions had been mentioned in either the Black or the O'Brien cases.

> Both Black and O'Brien involved surreptitious electronic surveillance by the Government, which was discovered after trial and which was plainly illegal under the Fourth Amendment[9]. . . . It is difficult to believe that the Court in Black and O'Brien was evolving a definitive construction of the Sixth Amendment without identifying the Amendment it was interpreting, especially in view of the well-established Fourth Amendment grounds for excluding the fruits of the illegal surveillance. If anything is to be inferred from these two cases with respect to the right to counsel, it is that when conversations with counsel have been overheard, the constitutionality of the conviction depends on whether the overheard conversations have produced, directly or indirectly, any of the evidence offered at trial. This is a far cry from the per se rule announced by the Court of Appeals below, for under that rule trial prejudice to the defendant is deemed irrelevant. Here, the courts below have already conducted the "judicial determination," lacking in Black and O'Brien, of the effect of the overheard conversations on the defendant's conviction, and there is nothing in their findings or in the record to indicate any "use of evidence that might be otherwise inadmissible." . . .

_____

[9]In order to overhear conversations, the government had used electronic listening devices similar to the tubular microphone found in Silverman v. United States, 365 U.S. 505 (1961), to constitute a violation of the Fourth Amendment due to unauthorized physical penetration of the petitioner's premises.

24

Had Weatherford testified at Bursey's trial as to the
conversation between Bursey and [his attorney]; had any of
the State's evidence originated in these conversations; had
those overheard conversations been used in any other way to
the substantial detriment of Bursey; or even had the
prosecution learned from Weatherford, an undercover agent,
the details of the Bursey-[attorney] conversations about the
trial preparations, Bursey would have a much stronger case.
. . . .

If the fact was, as found by the District Court, that
Weatherford communicated nothing about the two meetings to
anyone else, we are quite unconvinced that a constitutional
claim under the Sixth and Fourteenth Amendments was made
out. . . . As long as the information possessed by
Weatherford remained uncommunicated, he posed no substantial
threat to Bursey's Sixth Amendment rights. . . . [U]nless
Weatherford communicated the substance of the Bursey-
[attorney] conversations and thereby created at least a
realistic possibility of injury to Bursey or benefit to the
State, there can be no Sixth Amendment violation . . . .
There being no tainted evidence in this case, no
communication of defense strategy to the prosecution, and no
purposeful intrusion by Weatherford, there was no violation
of the Sixth Amendment.

Weatherford v. Bursey, 429 U.S. at 551-558.

For a defendant to be entitled to any type of remedy, he

must establish "that the constitutional infringement identified

has had or threatens some adverse effect upon the effectiveness

of counsel's representation or has produced some other prejudice

to the defense." United States v. Morrison, 449 U.S. 361, 365

(1981). Furthermore, if the defendant cannot establish such an

impact on the criminal proceeding, there is no basis for imposing

any remedy, because the proceeding "can go forward with full

recognition of the defendant's right to counsel and to a fair

trial." Id. This is true even if the violation may have been

25

deliberate.  Id.  The burden of proof to establish a violation
and resulting prejudice is on the defendant.  See United States
v. Solomon, 679 F.2d 1246, 1250 (8th Cir. 1982).

In this case, I find that defendant has failed to satisfy
his burden of proving a violation and resulting prejudice.  The
uncontroverted evidence establishes that defendant's calls to his
attorney were recorded after (1) defendant was informed by CCA
that all calls on the prison phones would be recorded, (2)
defendant was informed by the signs on all phones at CCA that
calls would be recorded, (3) defendant and his lawyer's office
were informed through recordings preceding every phone call that
calls were subject to monitoring and recording.  The
uncontroverted evidence also establishes that no one from the
FBI, the United States Marshal Service, or the United States
Attorney's Office heard any part of any attorney-client
conversation other than a few seconds which included nothing more
than "how are you doing?".

Defendant has not established that the government purposely
obtained the attorney-client phone calls.  To the contrary, the
government attempted to have those calls excluded by the wording
of the subpoena; and the government instructed anyone tasked with
listening to the recorded calls to immediately stop listening to
the call and record the number of seconds that had elapsed before

the call was stopped if indeed an attorney-client call slipped through.

Defendant has not established that anyone has overheard any significant part of any attorney-client call. One FBI agent heard the very beginning of one or more attorney-client calls and immediately stopped listening. One employee of the United States Attorney's Office heard a few seconds of approximately six or seven attorney-client calls, and none of those calls involved anything more than hello, how are you doing.

There is no evidence that any attorney-client discussion was overheard by anyone. Therefore, defendant clearly cannot establish any type of prejudice[10]. As in <u>Weatherford v. Bursey</u>, the information recorded by CCA has remained uncommunicated; therefore, the recordings pose no substantial threat to defendant's Sixth Amendment rights. Because no one has listened to the substance of the attorney-client conversations, there is no realistic possibility of injury to defendant or benefit to the government; therefore, there can be no Sixth Amendment violation. Because there was no tainted evidence in this case, no communication of defense strategy to the prosecution, and no

---

[10]Absent a showing of prejudice, defendant cannot make out a Fifth Amendment Due Process claim. <u>See</u> <u>United States v. Voigt</u>, 89 F.3d 1050 (3rd Cir.), <u>cert</u>. <u>denied</u>, 519 U.S. 1047 (1996), cited by defendant in his motion at pages 13-14, wherein the court held that one necessary showing for a Fifth Amendment claim is "actual and substantial prejudice".

purposeful intrusion by the government, there has been no violation of the Sixth Amendment.

## B.    WAIVER

In addition to the above, I find that defendant waived the attorney-client privilege by communicating with his attorney on the prison phones, because there is no question that he and his attorney knew the calls could be recorded.

The undisputed evidence is that defendant was informed upon arriving at CCA that all of his calls were subject to monitoring and recording.  The telephones all have signs on them reminding defendant that all calls are subject to monitoring and recording. The recorded message at the beginning of every call warns both parties that the calls are subject to monitoring and recording. Every five to ten minutes during a phone call from CCA, the parties are reminded again that the call is subject to monitoring and recording.

In <u>United States v. Hatcher</u>, 323 F.3d 666 (8th Cir. 2003), a defendant complained on appeal that the trial court erred in refusing to order the government to disclose the conversations between cooperating co-defendants and their attorneys, conversations which had been taped while the co-defendants were incarcerated.  The trial court had refused to order disclosure, finding that the calls were protected by the attorney-client privilege.  The Court of Appeals disagreed.

28

> The presence of the prison recording device destroyed the attorney-client privilege. Because the inmates and their lawyers were aware that their conversations were being recorded, they could not reasonably expect that their conversations would remain private. The presence of the recording device was the functional equivalent of the presence of a third party. These conversations were not privileged.

Id. at 674.

When prison inmates have been informed that telephone calls are monitored, consent to monitoring is implied by the inmate's use of the prison's telephones. United States v. Van Poyck, 77 F.3d 285, 292 (9th Cir. 1996) (any expectation of privacy in outbound calls from prison is not objectively reasonable), cert. denied, 519 U.S. 912 (1996). Even if the inmate has no other alternative, use of the phones to call his attorney is still implied waiver of the attorney-client privilege. See United States v. Horr, 963 F.2d 112 (8th Cir. 1992). In Horr, the Eighth Circuit concluded that it was the inmate's choice to use the prison telephone to arrange his escape, and thereby consented to the recording of those calls.

> Horr impliedly consented to the taping of his telephone conversations. Upon entering FMC, all prisoners are given an admission and orientation handbook which indicates that inmate telephone calls are monitored and recorded. Inmates are also told about this policy at orientation. . . . Horr signed a form indicating that he was aware of the telephone policy. Moreover, Horr testified that he had seen signs posted near the telephones which state: "The Bureau of Prisons has the authority to monitor conversations on this telephone. Your use of the institutional telephone constitutes consent to this monitoring". . . . Horr argues that he did not consent to the taping because he had no choice concerning whether he wanted to have his calls

29

monitored.  We disagree.  Horr was aware of the telephone
monitoring policy.  It was his choice to use the telephone
to conduct his illegal business.  Having gambled by
discussing his escape on the prison telephone, Horr cannot
now be heard to complain that he lost.

Id. at 1126.

The attorney-client privilege belongs to and exists solely

for the benefit of the client, not the attorney.  Henderson v.

United States, 815 F.2d 1189, 1192 (8th Cir. 1987); In re Grand

Jury Proceedings, 655 F.2d 882, 885 (8th Cir. 1981).  Here, it is

clear that defendant waived his attorney-client privilege by

calling his attorney when he well knew that the calls could be

monitored and recorded by CCA[11].

## IV.  CONCLUSION

I find that defendant has failed to establish a Sixth

Amendment violation of his right to effective assistance of

counsel, he has failed to establish a Fifth Amendment Due Process

violation, and he has waived any attorney-client privilege that

may have existed in his phone calls to his attorney.  Therefore,

it is

---

[11]Although Mr. Osgood stated that he had verbally requested
that his calls not be recorded, the evidence establishes that
every phone call from CCA includes a recording at the beginning
and every five to ten minutes during the call warning the parties
that the call is subject to monitoring and recording.  It is
reasonable to expect someone hearing these recordings to inquire
at the institution if the calls really are being recorded given
the continued automated warnings on each call from CCA.
Presumably if such an inquiry had been made, Mr. Osgood would
have been informed that his number was still being recorded since
no written request for privatization had been received by CCA.

Case 4:05-cr-00344-ODS   Document 347   Filed 03/18/08   Page 30 of 31

RECOMMENDED that the court, after an independent review of the pleadings and applicable law, enter an order denying the defendant's motion to dismiss the indictment and denying defendant's alternate remedy of suppression.

Counsel are advised that, pursuant to 28 U.S.C. § 636(b)(1), each has ten days from the date of receipt of a copy of this report and recommendation to file and serve specific objections unless an extension of time for good cause is obtained.

*/s/ Robert E. Larsen*
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
March 18, 2008

31