IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action No. |
| | ) | 05-00344-01-CR-W-ODS |
| GARY EYE, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION TO DENY
DEFENDANT'S MOTION TO SUPPRESS RECORDED PHONE CONVERSATIONS
FOR IMPROPER USE OF RULE 17(C)**

Before the court is defendant's motion to suppress recorded telephone conversations on the ground that the government improperly used Rule 17(c). I find that the government did improperly use Rule 17(c) but that suppression is not warranted because there was no constitutional violation and because defendant admittedly suffered no prejudice from the violation. Therefore, defendant's motion to suppress should be denied.

*I.   BACKGROUND*

On September 29, 2005, an indictment was returned charging defendant with two counts of interference with federally protected activities, in violation of 18 U.S.C. § 245(b)(2)(B); one count of using or discharging a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(iii); two counts of using or discharging a firearm during a crime of violence causing murder, in violation of 18 U.S.C. §§ 924(c)(1)(A)(iii) and (j)(1); one count of tampering with a

witness, in violation of 18 U.S.C. §§ 1512(a)(1)(C) and
(a)(3)(A); one count of obstruction of justice, in violation of
18 U.S.C. § 1519; and one count of using fire to commit a felony,
in violation of 18 U.S.C. § 844(h)(1).  Co-defendant Steven
Sandstrom was charged in all of these counts and with one count
of threatening to retaliate against a federal witness, in
violation of 18 U.S.C. § 1513(b)(2).

On November 26, 2007, defendant filed the instant motion to
suppress (document number 265).  On December 5, 2007, the
government filed a response indicating that it was not merely
searching for impeachment material as was the case in Cardarella,
cited by defendant, and pointing out that defendant was not
prejudiced (document number 282).

I held a hearing on defendant's motion on December 6, 2007.
Defendant was present, represented by John Osgood.  The
government was represented by David Ketchmark and Eric Gibson.

Special Agent Heith Janke, Federal Bureau of Investigation,
testified.  In addition, the following exhibits were admitted:

P. Ex. 1  Stipulation

P. Ex. 2  Trial subpoena issued to CCA requesting recorded
          calls from August 15, 2007, through August 30,
          2007

## II. *FINDINGS OF FACT*

Based on the evidence presented at the hearing, I make the
following findings of fact:

1. The indictment returned on September 29, 2005, contained a count against defendant and co-defendant Steven Sandstrom alleging murder to prevent the victim from relaying information to law enforcement, and another count against Sandstrom for threatening to retaliate against a witness (Tr. at 12-13). In addition, a criminal complaint was filed against Justin Buchanan which alleges that he threatened retaliation against a witness who was believed to be cooperating in the criminal case against defendant and Sandstrom with Sandstrom having initiated that threat (Tr. at 13).

2. In February 2006, agents spoke with Justin Buchanan who provided information suggesting that defendant may have been engaging in ongoing threats to have witnesses harmed while he was at CCA (Tr. at 14).

3. In approximately July 2006, an inmate at CCA named Eric Eymard contacted the FBI requesting that he be interviewed (Tr. at 14). Eymard was interviewed by the FBI on July 10, 2006 (Tr. at 15). Eymard said that defendant was engaging in plots to have witnesses harmed (Tr. at 15). Eymard indicated that defendant's fiancée at the time but who is now defendant's wife, Stephanie Eye, was also involved (Tr. at 15). Eymard said that defendant used the phone a lot at CCA (Tr. at 15).

4. Based on the charges in the original indictment dealing with killing or harming witnesses, the information received from

3

Mr. Buchanan, and the information received from Mr. Eymard, the FBI decided to open a collateral investigation surrounding the alleged threats in which defendant was purportedly involved (Tr. at 15-16, 24). On August 30, 2006, a grand jury subpoena was issued in connection with that threat investigation in order to obtain recordings of defendant's phone calls at CCA from June 8, 2006, through the date of the subpoena (Tr. at 16, 26). June 8, 2006, was chosen as the start date because that was the day Eric Eymard was placed in segregation at CCA and is the earliest date he would have had contact with defendant (Tr. at 16).

    5.    CCA provided recordings of defendant's telephone calls as requested (Tr. at 16). Those calls were reviewed by FBI agents and Elsie Marko of the United States Attorney's Office (Tr. at 16). According to Ms. Marko, there were calls that appeared to corroborate the information provided by Mr. Eymard (Tr. at 16-17).

    6.    CCA included attorney-client calls in the recorded disks even though the subpoena had requested that those calls be excluded (Tr. at 17). In August or September 2007 when the government disclosed those disks to the defense, government counsel became aware that attorney-client calls were on the disks (Tr. at 17). At that point the government had turned over to the defense the calls that were provided by CCA in response to the subpoena (Tr. at 17). By then the covert nature of the

4

investigation was out in the open (Tr. at 17).

    7.   On August 22, 2007, Special Agents Janke and Gothard attempted to interview defendant's wife, Stephanie Eye (Tr. at 19, 27). When they approached her at her residence, she was on the phone, and the agents believed she was talking to defendant (Tr. at 19).

    8.   On October 17, 2007, the government obtained a trial subpoena requesting defendant's recorded conversations between August 15, 2007, and August 30, 2007 (Tr. at 18, 27, 33-34; P. Ex. 2). This was the two weeks following defendant's awareness of the threat investigation, including who was cooperating and what those witnesses had said (Tr. at 18-19, 33-34). That information came out when the government provided discovery to the defense (Tr. at 27, 28).

    9.   The subpoena directed CCA to deliver the recordings of defendant's phone calls to the courthouse on January 10, 2008 (the date the trial was set); however, CCA complied with the subpoena by mailing the additional disk to Special Agent Janke (Tr. at 30, 34). The disk was copied and ready to be turned over to defense counsel, but at that time the issue of the propriety of turning over the previous disks due to attorney-client calls had been raised and the government waited for some clarification from the court on whether it was appropriate to turn over this additional disk (Tr. at 31, 32, 40).

5

10. Special Agent Janke has not listened to the recorded calls (Tr. at 35). When he was going to try to isolate the call with Stephanie Eye on the date the agents tried to interview her, he saw that the next call was to defendant's attorney, so he did not listen (Tr. at 35-36). As soon as the government got approval from the court to turn over the disk, defense counsel received a copy of it (Tr. at 36, 37).

11. Defense counsel agreed that no prejudice resulted from the government's actions (Tr. at 38).

### III. RULE 17(C)

Federal Rule of Criminal Procedure 17 states in pertinent part as follows:

> (a) Content. A subpoena must state the court's name and the title of the proceeding, include the seal of the court, and command the witness to attend and testify at the time and place the subpoena specifies. The clerk must issue a blank subpoena -- signed and sealed -- to the party requesting it, and that party must fill in the blanks before the subpoena is served.
>
> * * * * *
>
> (c) Producing Documents and Objects.
>
> (1) In General. A subpoena may also order the witness to produce any books, papers, documents, data or other objects the subpoena designates. The court may direct the witness to produce the designated items in court before trial or before they are to be offered in evidence. When the items arrive, the court may permit the parties and their attorneys to inspect all or part of them.

Rule 17(c) describes special matters concerning a subpoena duces tecum, giving the court discretion to direct that the

6

subpoenaed items be produced in advance of trial and made available to both sides for inspection. <u>United States v. Florack</u>, 838 F. Supp. 77, 79 (W.D.N.Y. 1993).

Rule 17(c) does not authorize an ex parte procedure for obtaining records prior to trial. See <u>United States v. Florack</u>, 838 F. Supp. 77, 80 (W.D.N.Y. 1993) ("'a different situation would be presented' if the subpoena requested production of documents at trial. That is a critical difference."); <u>United States v. Najarian</u>, 164 F.R.D. 484, 487-488 (D. Minn. 1995) ("Rule 17(c) expressly contemplates the review of documents so subpoenaed by the other parties to the dispute"); <u>United States v. Urlacher</u>, 136 F.R.D. 550, 556 (W.D.N.Y. 1991) ("[t]here can be no 'right' to ex parte procurement of subpoenaed documents pretrial if the court has discretion to supervise their production by permitting both parties' inspection prior to trial.").

Rule 17(c) was not intended to provide an additional means of discovery. <u>Bowman Dairy Co. v. United States</u>, 341 U.S. 214, 220 (1951). Rather, "[i]ts chief innovation was to expedite the trial by providing a time and place <u>before</u> trial for the inspection of the subpoenaed materials." <u>Id</u>. (emphasis in the original). When deciding whether to require the production of documents prior to trial, courts must determine whether the moving party has shown that (1) the subpoenaed documents are

7

relevant, (2) they are admissible, and (3) they have been requested with adequate specificity. <u>United States v. Hang</u>, 75 F.3d at 1283. <u>See</u> <u>also</u> <u>United States v. Nixon</u>, 418 U.S. 683, 699-700 (1974). A Rule 17(c) subpoena cannot properly be issued upon a "mere hope." <u>United States v. Hang</u>, 75 F.3d 1275, 1283 (8th Cir. 1996), citing <u>United States v. Cuthbertson</u>, 630 F.2d 139, 146 (3d Cir. 1980) ("We do not think that [a] 'mere hope' justifies enforcement of a subpoena under [R]ule 17(c)."), <u>cert</u>. <u>denied</u>, 449 U.S. 1126 (1981).

In this case, there is no question that the government violated Rule 17(c). The question is what is the appropriate remedy.

The subpoena was obtained without a court order. However, defendant acknowledges that in the Western District of Missouri, this has been an acceptable practice for years[1]. The government requested production of the recorded phone calls on the day of

---

[1] "In the past attorneys for both the government and the defense have taken a somewhat liberal approach in the use of 17(c). One interpretation of the rule is that since attorneys are officers of the court and may issue trial subpoenas under the authority of the court, bearing the seal of the Clerk of the Court, that such constitutes a 'court order' to appear to testify. It follows therefore that a Rule 17(c) subpoena for pre-production of documents is merely an extension of this power and the rule is complied with so long as the issuing party provides the opposing party notice and copies of the materials delivered to the Court per the subpoena. [footnote] Undersigned counsel has used the Rule in prior cases in this manner both as an Assistant U.S. Attorney and a defense attorney without incident in past cases." See p. 1-2 of defendant's motion.

8

trial; therefore, there was no finding by the court that the subpoenaed material was relevant, admissible, and requested with adequate specificity, which is required for pre-trial production. Despite the subpoena having directed CCA to produce the material on the day of trial, CCA mailed the material to the agent shortly after the subpoena was received. The government states that it had planned and prepared to turn over the material to defense counsel upon receipt by CCA; however, at the time it received the recorded phone calls, the issue of attorney-client calls having been recorded and disseminated to attorneys had just been raised by the defendant and the government waited for direction from the court before doing anything with the calls (including listening to the disks themselves). Defendant does not contradict these facts and raises no issue with respect to the intention of government counsel to share the material once it was received.

The material sought was not requested with adequate specificity as required for pretrial production under 17(c). As discussed above, a Rule 17(c) subpoena cannot be issued upon a mere hope. In this case, the evidence establishes that Special Agents Janke and Gothard "believed" Stephanie Eye was on the phone with her husband, defendant Gary Eye (no evidence was presented that she was indeed talking to defendant), when the agents attempted to question her on August 22, 2007. In late August or early September 2007, defense counsel were made aware

9

of the collateral threat investigation. The Rule 17(c) subpoena was issued because of "a desire to try to obtain calls as it would have related to when the disclosure would have gone out **to see if** Mr. Eye and his wife or other individuals were still talking about the desire to have witnesses harmed" (emphasis added)(Tr. at 18).

The Rule 17(c) subpoena was issued for the exact same reason the government sought a grand jury subpoena the year before -- they had reason to believe that defendant was using the phone at CCA to further a plan to harm or intimidate witnesses and they wanted to see if there was any evidence on those recorded phone calls to substantiate that belief. In 2007, the government believed that defendant was continuing to try to facilitate a plan to harm or intimidate witnesses using his wife, and it issued a Rule 17(c) subpoena to see if there was any evidence on recorded phone calls to substantiate their belief[2].

Under Rule 17(c), in order to require production of material prior to trial, the moving party must show: (1) that the materials are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise

---

[2] Although in its response the government alleges it was obtaining evidence of consciousness of guilt, the evidence presented at the hearing was that the reason the calls were requested was to see if there was any further evidence of an intent to threaten witnesses given the defendant's newly-obtained knowledge that a threat investigation had been undertaken by the government.

10

of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general "fishing expedition." United States v. Nixon, 418 U.S. 683, 699-700 (1974). Here, the government would be unable to establish that it could not properly prepare for trial without the production and inspection, because it had no idea whether the recorded phone calls during that two-week period would contain any relevant conversations. It was, indeed, a general fishing expedition.

All of this, however, applies only if a subpoena seeks pretrial production. It is undisputed that the government did not request pretrial production; rather, CCA personnel took it upon themselves to respond to the subpoena prior to trial and by mailing the material to the FBI rather than delivering it to the court as directed. It is also undisputed that this is a normal procedure, at least in the Western District of Missouri, and has been for a number of years. It is also undisputed that defendant suffered no prejudice since the recorded phone calls were turned over by the government to the other parties as soon as the court indicated that was appropriate given the fact that there may be attorney-client conversations on those disks. The government has had no advantage, since the evidence establishes that no one from

11

the government listened to the calls before the disk was turned over to the defendant. Finally, there is some question about whether defendant even has standing to challenge the validity of the subpoenas. See United States v. Compton, 28 F.3d 1214 (Table), 1994 WL 328303 *3 (6th Cir. July 1, 1994) ("The district court expressed doubt, and we believe correctly, regarding whether or not Compton even had standing to challenge the validity of the subpoenas. Certainly the universities, had they wished, could have challenged the subpoenas if compliance would have been unreasonably burdensome. The rule, however, contains no express provision permitting the defendant to challenge the validity of subpoenas.")

I find that there was a "harmless technical irregularity" at most in the government's obtaining the recorded phone calls in the manner described above. See United States v. Duncan, 598 F.2d 839, 867 (4th Cir. 1979) (the government's Rule 17(c) subpoena directing documents to be produced to the FBI prior to trial was "harmless technical irregularity at most" and there was no finding of prejudice). I also find that defendant's request that the recorded phone calls obtained through the Rule 17(c) subpoena be suppressed is neither justified nor supported by the law.

The exclusionary rule was created by the Supreme Court in Mapp v. Ohio, 367 U.S. 643 (1961). The exclusionary rule is not

12

a remedy the courts apply lightly. It has been used primarily to deter certain Fourth and Fifth Amendment violations, including unconstitutional searches and seizures, Mapp v. Ohio, 367 U.S. at 655-657, and confessions exacted in violation of the right against compelled self-incrimination or due process, Dickerson v. United States, 530 U.S. 428, 435 (2000).

> Suppression of evidence, however, has always been our last resort, not our first impulse. The exclusionary rule generates "substantial social costs," United States v. Leon, 468 U.S. 897, 907 (1984), which sometimes include setting the guilty free and the dangerous at large. We have therefore been "cautio[us] against expanding" it, Colorado v. Connelly, 479 U.S. 157, 166 (1986), and "have repeatedly emphasized that the rule's 'costly toll' upon truth-seeking and law enforcement objectives presents a high obstacle for those urging [its] application," Pennsylvania Bd. of Probation and Parole v. Scott, 524 U.S. 357, 364-365 (1998) (citation omitted). We have rejected "[i]ndiscriminate application" of the rule, Leon, supra, at 908, and have held it to be applicable only "where its remedial objectives are thought most efficaciously served," United States v. Calandra, 414 U.S. 338, 348 (1974), -- that is, "where its deterrence benefits outweigh its 'substantial social costs,'" Scott, supra, at 363 (quoting Leon, supra, at 907).

The Supreme Court has generally declined to impose the exclusionary rule for non-Constitutional violations. See Sanches-Llamas v. Oregon, 548 U.S. 331 (2006) (violation of foreign nationals' right to have their consulate informed of their arrest or detention, finding the exclusionary rule a "vastly disproportionate remedy"); Hudson v. Michigan, 547 U.S. 586 (2006) (no exclusion of evidence for violation of knock-and-announce rule). In addition, the Supreme Court has warned that the exclusionary rule should be used sparingly. "Any claim for

13

the exclusion of evidence logically relevant in criminal prosecutions is heavily handicapped. It must be justified by an over-riding public policy expressed in the Constitution or the law of the land." Nardone v. United States, 308 U.S. 338, 340 (1939).

> The few cases in which we have suppressed evidence for statutory violations do not help Sanchez-Llamas. In those cases, the excluded evidence arose directly out of statutory violations that implicated important Fourth and Fifth Amendment interests. McNabb [v. United States, 318 U.S. 332 (1943)], for example, involved the suppression of incriminating statements obtained during a prolonged detention of the defendants, in violation of a statute requiring persons arrested without a warrant to be promptly presented to a judicial officer. We noted that the statutory right was intended to "avoid all the evil implications of secret interrogation of persons accused of crime," 318 U.S. at 344 . . . . Similarly, in Miller [v. United States, 357 U.S. 301, 305 (1958)], we required suppression of evidence that was the product of a search incident to an unlawful arrest; see California v. Hodari D., 499 U.S. 621, 624 (1991) ("We have long understood that the Fourth Amendment's protection against 'unreasonable . . . seizures' includes seizure of the person").

Clearly no Constitutional violation has occurred in this case, and defense counsel freely admitted that because he was given copies of the disks shortly after the government received them (and before the government listened to them) that the defendant has suffered no prejudice. This case certainly does not call for suppression of the recorded phone calls.

The only legal authority cited by defendant in his motion is the order filed by Chief Judge Fernando Gaitan, Jr., in United States v. Cardarella, 07-00007-02-CR-W-FJG. However, that case

14

does not support defendant's request.  In Cardarella, the defendants used a Rule 17(c) subpoena to obtain for impeachment purposes recorded phone calls of a government witness incarcerated at CCA.  Defendant obtained the recordings on June 4, 2007.  The trial began on October 22, 2007, and the government learned of the recordings on October 25, 2007.  Therefore, in that case, the court was unable to consider less-drastic remedies such as ordering that the material be turned over or continuing the trial to give the government time to review the material.  In that case, the trial had already started; jeopardy had already attached.

Here, defendant has had possession of the subpoenaed material for the past six months, and the trial is still a month away.  There is no evidence that the government intended to keep the evidence secret from the defendant; in fact, the uncontradicted evidence establishes that the government intended to turn over the disks upon their receipt, and that the government did indeed turn them over once the court resolved the issue of the attorney-client calls having been copied to the disks.  Defendant is in no worse position than he would have been had the government properly used Rule 17(c).

I am concerned, however, that the government appears to be less than consistent in its interpretation of Rule 17(c).  In one case, Cardarella, the government states that a Rule 17(c)

15

subpoena cannot be used without a court order, when in substance the government used Rule 17(c) without first obtaining a court order in this case. Therefore, the government should be admonished (1) not to use a Rule 17(c) subpoena without a court order[3], and (2) to circulate among their entire staff the position the United States Attorney's Office will take with respect to the use of Rule 17(c) so that their arguments to the court are consistent from case to case.

## IV. CONCLUSION

I find that (1) the government's use of Rule 17(c) in this case was at most a harmless technical irregularity, (2) defendant admitted he suffered no prejudice, and (3) defendant is in no

---

[3]Although the government technically did not request advance production of the material, it is common practice for CCA to honor the subpoenas upon receipt and to mail the material to the agent. The government's practice of requesting material in the hopes that something incriminating will be found, without a court order, may lead to the inference that although pre-trial production was not requested, it was certainly expected. Furthermore, the defendant in Cardarella obtained voluntary production of the recorded phone calls rather than the institution complying with the subpoena. The government argued, and Judge Gaitan found, that this technicality did not change the fact that in substance, it was a Rule 17(c) subpoena issued without a court order. The practice of issuing a subpoena directing the recipient to provide the material in court on the day of trial, knowing full well that the material will be mailed to the agent prior to trial, creates the possibility that the agent will fail to share all of the material with the defense (or vice versa, which was the case in Cardarella) with no one being the wiser -- the very thing that Rule 17(c) was designed to prevent. I do not mean to imply that any agent or attorney in this case would be inclined to do such a thing. I simply point out the inherent danger in using Rule 17(c) in this fashion.

16

worse position now than he would have been had the government not violated Rule 17(c). Therefore, it is

RECOMMENDED that the court, after an independent review of the pleadings and applicable law, (1) enter an order denying the defendant's motion to suppress the recorded phone calls obtained through use of a Rule 17(c) subpoena, and (2) admonish the government to make consistent use of its Rule 17(c) arguments before this court including obtaining a court order prior to issuing a Rule 17(c) subpoena.

Counsel are advised that, pursuant to 28 U.S.C. § 636(b)(1), each has ten days from the date of receipt of a copy of this report and recommendation to file and serve specific objections unless an extension of time for good cause is obtained.

        /s/ Robert E. Larsen
        ROBERT E. LARSEN
        United States Magistrate Judge

Kansas City, Missouri
March 31, 2008