IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Criminal Action No. |
| v. ) | 05-00344-01-CR-W-ODS |
| ) | |
| GARY EYE, ) | |
| ) | |
| Defendant. ) | |

### REPORT AND RECOMMENDATION TO DENY DEFENDANT'S MOTION TO SUPPRESS EVIDENCE DUE TO ATTEMPTS TO VIOLATE THE ATTORNEY-CLIENT PRIVILEGE

Before the court is defendant's motion to suppress testimony of Justin Buchanan on the ground that the government attempted to violate the attorney-client privilege by having defendant and Justin Buchanan placed in the same cell at CCA which enabled Buchanan to hear defendant make inculpatory statements. I find that (1) there is no evidence that defendant and Buchanan were ever in the same cell, and (2) there is no evidence that the government ever attempted to have Buchanan placed in the same cell or anywhere near defendant. Therefore, defendant's motion to suppress Buchanan's testimony should be denied.

### 1.  *BACKGROUND*

On September 29, 2005, an indictment was returned charging defendant with two counts of interference with federally protected activities, in violation of 18 U.S.C. § 245(b)(2)(B); one count of using or discharging a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(iii); two

counts of using or discharging a firearm during a crime of violence causing murder, in violation of 18 U.S.C. §§ 924(c)(1)(A)(iii) and (j)(1); one count of tampering with a witness, in violation of 18 U.S.C. §§ 1512(a)(1)(C) and (a)(3)(A); one count of obstruction of justice, in violation of 18 U.S.C. § 1519; and one count of using fire to commit a felony, in violation of 18 U.S.C. § 844(h)(1).  Co-defendant Steven Sandstrom was charged in all of these counts and with one count of threatening to retaliate against a federal witness, in violation of 18 U.S.C. § 1513(b)(2).

On January 22, 2008, defendant filed a motion in limine to exclude Buchanan's testimony on the above-stated ground as well as on several other grounds (document number 303).  On February 15, 2008, the government filed a response (document number 325) arguing that no one associated with the government directed Justin Buchanan to elicit information from defendant.

On March 11, 2008, Judge Smith referred this portion of defendant's motion in limine to me, interpreting it as more of a motion to suppress Buchanan's testimony due to a constitutional violation.  I held a hearing on defendant's motion on March 17, 2008.  Defendant appeared in person, represented by John Osgood and Lance Sandage.  The government was represented by Assistant United States Attorneys David Ketchmark and Mike Green.  Government counsel and defense counsel agreed that there is no

2

issue with respect to Eric Eymard[1] because the government will not call Eymard in its case in chief, in rebuttal, or in any penalty phase of defendant's trial (Tr. at 3-6).

The following witnesses testified at the hearing:

1. Jack Hildebrand, Supervisory Deputy United States Marshal

2. Special Agent Arch Gothard, Federal Bureau of Investigation

3. Lieutenant George Green, CCA

The following exhibits were admitted:

P. Ex. 1   Justin Buchanan's proffer letter

P. Ex. 2   FBI 302 on the initial proffer interview with Justin Buchanan dated February 10, 2006

P. Ex. 3   FBI 302 of interview with Justin Buchanan on October 17, 2006

P. Ex. 4   Alert Notice, U.S. Marshal Form 130, for Justin Cowen Buchanan to be separated from Gary Eye and Steven Sandstrom dated November 18, 2005

P. Ex. 5   U.S. Marshal Form 129 on Justin Buchanan

P. Ex. 8   FBI 302 on interview of Lieutenant George Green

P. Ex. 9   FBI 302 on the interview of Justin Buchanan conducted on November 17, 2005

P. Ex. 10  Record of Gary Eye's cell locations at CCA

P. Ex. 11  Record of Justin Buchanan's cell locations at CCA

D. Ex. 1   Diagram of CCA's segregation unit drawn by Lt. George Green

---

[1] Defendant's motion seeks to exclude the testimony of both Eric Eymard and Justin Buchanan.

3

## II. FINDINGS OF FACT

Based on the evidence submitted at the hearing, I make the following findings of fact:

1. On November 15, 2005, Special Agent Janke went to the St. Clair County Jail and observed correspondence between Justin Buchanan and co-defendant Steven Sandstrom that had been recovered by jail personnel (Tr. at 29-30, 48). Letters were also recovered at Crossroads Correctional Center where Buchanan was housed (Tr. at 30). The letters included discussions about potential threats towards witnesses in Sandstrom's case (Tr. at 30, 60). In the letters, Sandstrom indicated that he wanted the witnesses hurt or harmed (Tr. at 30). Buchanan had also written letters about harming witnesses (Tr. at 30).

2. On November 17, 2005, Special Agents Janke and Gothard went to Crossroads Correctional Center and met with Justin Buchanan (Tr. at 30-31). Buchanan admitted his intent in writing the letters (Tr. at 31). The main focus of the interview was Buchanan's involvement, but part of the conversation may have involved mentioning defendant Gary Eye (Tr. at 33, 48).

3. On November 18, 2005, a criminal complaint was filed charging Buchanan with making threats (Tr. at 31). Special Agents Gothard and Stinnett took an arrest warrant up to Crossroads Correctional Center and picked up Justin Buchanan (Tr. at 32, 47). Buchanan had been scheduled to be released from

4

state custody at that time (Tr. at 32). The agents delivered Buchanan directly to the United States Marshal Service in the courthouse (Tr. at 32, 33-34, 47).

4. During the hour-long drive from Crossroads to the federal courthouse, Buchanan asked Agent Gothard if "Stevie" (referring to Steven Sandstrom) was also going to be charged (Tr. at 33, 49). Gothard stated that he knew Stevie was "fucked" if charged with conspiracy to hire a hit man (Tr. at 33). Special Agent Gothard did not discuss the charges or the case with Buchanan (Tr. at 49). At no time did Special Agent Gothard tell the United States Marshal to put Buchanan in a cell with defendant Eye (Tr. at 62).

5. Justin Buchanan was placed in the segregation unit at CCA because he had thrown hot water in another inmate's face (Tr. at 84).

6. After Buchanan was appointed a lawyer, Robert Martin, the government negotiated with Mr. Martin about the possibility of Buchanan cooperating (Tr. at 34). Special Agent Gothard met with Buchanan in the U. S. Attorney's Office on February 10, 2006, to do a proffer (Tr. at 36). An FBI 302 was prepared summarizing the proffer session (Tr. at 38; P. Ex. 2). Special Agent Gothard had not spoken to Mr. Buchanan since he originally arrested him on November 18, 2005 (Tr. at 36-37, 41). No other agent spoke to Buchanan, no other agent transported Buchanan,

5

other than after his original arrest or during his proffer session (Tr. at 37).

    7.  During Buchanan's proffer session, he provided information about both Sandstrom and defendant Eye, as well as other individuals (Tr. at 38-39; P. Ex. 2). In the presence of the two special agents and Buchanan's attorney, the Assistant United States Attorney told Buchanan not to have any further contact with defendant Gary Eye (Tr. at 39, 56). Buchanan acknowledged that he understood, and said he would have no contact with Eye (Tr. at 39, 56).

    8.  Sometime around mid-October 2006, agents learned that Justin Buchanan was trying to sell information about defendant's case to other inmates (Tr. at 41, 57). On October 17, 2006, Special Agents Gothard and Janke met with Buchanan to confront Buchanan about selling information (Tr. at 41). Buchanan adamantly denied having tried to sell information about defendant's case (Tr. at 41).

    9.  On January 24, 2007, Justin Buchanan was involved in an altercation with another inmate, Ed Branch, at CCA (Tr. at 43). Special Agent Gothard interviewed Buchanan who said that he was attacked by Mr. Branch because it was believed that Buchanan was cooperating in the investigation against defendant Gary Eye and co-defendant Sandstrom (Tr. at 43). Shortly thereafter, Buchanan was transferred to Caldwell County (Tr. at 43).

10. On July 16, 2007, the agents interviewed correctional officers Schilling and Helsley and Lieutenant Green regarding the altercation between Buchanan and Branch (Tr. at 44, 79). Special Agent Gothard wanted to know who would have been in the area during the altercation to see who may have been a witness to the yelling about why the fight was occurring (Tr. at 46, 79).

11. When a person is incarcerated in a jail or detention center, he can be designated as a separatee with another inmate, i.e., housing of the two inmates is done in separate areas of the jail or detention center in order to separate them for safety, security, or other reasons (Tr. at 8). The United States Marshal Service requests separation of the inmates (Tr. at 9).

12. When a prisoner comes into the custody of the United States Marshal, he is transported to CCA in a CCA van or transport vehicle (Tr. at 27). Any paperwork, including separatee notices, are given to CCA personnel who take the documents with them during the transport to CCA with the defendant (Tr. at 27).

13. Justin Buchanan came into the custody of the United States Marshal Service on November 18, 2005 (Tr. at 12, 26). He was booked into CCA in Leavenworth, Kansas, on that day, where he remained until January 29, 2007, when he was moved to the Caldwell County Jail (Tr. at 12). On November 9, 2007, Caldwell County requested that Buchanan be removed, and he was placed back

7

in CCA on that date (Tr. at 12).  Caldwell County had requested the removal of 15 "troublesome or difficult prisoners", one of whom was Justin Buchanan (Tr. at 20).

  14. On November 18, 2005, when Buchanan originally was placed at CCA, an alert notice was completed indicating that Justin Buchanan should be kept separate from defendant (Tr. at 13, 46).  The notice was presented to CCA; and a representative from CCA, Scott A. Woodward, signed the notice on November 18, 2005 (Tr. at 13, 81; P. Ex. 4).  The only way a separatee request can be lifted is if the requesting agency lifts it in writing (Tr. at 82).  At no time did the United States Marshal Service request that the separatee order be lifted (Tr. at 13).  No one from the United States Attorney's Office or any federal agency besides the United States Marshal's Service could request that the separatee order be lifted (Tr. at 82-83).  When Buchanan was returned to CCA on November 9, 2007, another Alert Notice was presented to CCA to reiterate the original separatee request (Tr. at 21-22).  Supervisory Deputy United States Marshal Jack Hildebrand also talked to CCA about the need to keep Buchanan and defendant separated (Tr. at 23).

  15. Justin Buchanan is considered a high-risk prisoner because of his involvement in prisoner altercations (Tr. at 16).

  16. At no time did Special Agent Gothard or any other FBI agent request that Justin Buchanan be placed in close proximity

8

to defendant Eye (Tr. at 46).

17. During his February 10, 2006, proffer, Justin Buchanan told the FBI that he "talked with Eye in Eye's cell before correctional officer's [sic] realized that the U.S. Marshall's [sic] had a no contact provision between Buchanan and Eye." (P. Ex. 2).

18. CCA's segregation unit is designed in a triangular shape with a wall down the center (Tr. at 66, 72). On one side is a two-tiered line of cells numbered 101-109 on the bottom, and 201-210 on the top (Tr. at 66, 68; D. Ex. 1). There is a guard area in the center of the triangle from which all of those cells can be observed (Tr. at 66; D. Ex. 1). Showers are located on the wall at the bottom of the triangular unit (Tr. at 66). There are four showers which serve both sides of the triangular unit (Tr. at 67).

19. Defendant Eye was housed on the bottom tier of the segregation cells for a long time, and then was moved to cell 204 (Tr. at 68). At some point, CCA officials learned that there was a hole in the wall between cell number 204, occupied by Gary Eye, and cell number 205, occupied by Eric Eymard (Tr. at 64-65).

20. When an inmate who has a separatee order is placed in segregation, he is not allowed in the same cell as the person from whom he is to be separated (Tr. at 69). The two inmates could be placed in adjoining cells, however (Tr. at 69-70).

9

Inmates in the segregation unit can yell to each other from any cell in the unit (Tr. at 70). The cell doors are solid with a solid window and a food tray slot (Tr. at 70). Inmates from the opposite side of the triangular segregation unit walk past the cells mentioned above on their way to the showers, and they can yell to inmates in those cells (Tr. at 71).

21. Inmates in segregation can have a cell mate unless the inmate is facing the death penalty (Tr. at 74). If an inmate comes into CCA's segregation unit with a separatee order, the shift supervisor, or captain, is the person who has the password to put into the computer to allow an inmate into the same cell house (Tr. at 73-74). As soon as an inmate comes into segregation, Lt. Green would know about any separatee orders associated with that inmate (Tr. at 75). No one ever told Lt. Green to put Justin Buchanan in a cell with Gary Eye or that it would be okay to house them together (Tr. at 77, 78, 80, 85).

22. Defendant was never housed in the same cell with Justin Buchanan (Tr. at 77, 84-85, 86-87). In order for Buchanan to be placed in the same cell with defendant, a captain would have to override the computer system with a password (Tr. at 86). If that had occurred, the computer would maintain a record of that override (Tr. at 87). Neither Lt. Green nor the second shift lieutenant, Lt. Bigelow, have authority to put separatees in the same cell (Tr. at 87).

10

23.  The government provided copies of CCA's records of defendant's cell locations and Justin Buchanan's cell locations (P. Ex. 10; P. Ex. 11).  Those records indicate that at no time between October 11, 2005 (when Gary Eye entered CCA) and February 15, 2008 (the latest date on either report) was Gary Eye in the same cell as Justin Buchanan (P. Ex. 10; P. Ex. 11).  For 13 days from May 25, 2006, until June 7, 2006, defendant was in cell 105 of L-pod and Buchanan was in cell 106 of L-pod, which are adjacent cells (P. Ex. 10; P. Ex. 11).  Inmates with separatee orders can be in adjacent cells, just not in the same cell (Tr. at 69-70).  At no other time were defendant and Buchanan in adjacent cells.

### *III. SIXTH AMENDMENT*

Any secret interrogation of the defendant, from and after the finding of the indictment, without the protection afforded by the presence of counsel, violates a defendant's Sixth Amendment right to counsel.  <u>Massiah v. United States</u>, 377 U.S. 201 (1964). This includes statements made by a defendant without his attorney when the defendant does not know that he is speaking to someone working at the direction of the government.  <u>Id</u>.

In order to prevail on a claim of "secret interrogation", a defendant must show that his right to counsel had attached, that the person eliciting incriminating statements was a "government agent", and that the government agent deliberately elicited

11

incriminating statements from him.  Moore v. United States, 178 F.3d 995, 999 (8th Cir. 1999).  There is no question that defendant's Sixth Amendment right to counsel had attached.  The question is whether Buchanan was a government agent and whether Buchanan deliberately elicited incriminating statements from defendant.

"[A]n informant becomes a government agent for purposes of [Massiah] only when the informant has been instructed by the police to get information about the particular defendant."  Id. at 999.  It is not enough that the government has an agreement with an individual to disclose his knowledge of drug activity in hopes of receiving a more favorable plea agreement.  Id.  Rather, the individual must have been directed by the government to obtain additional incriminating evidence against a specific defendant.  Id.

Even acting as a "passive listening post" in gathering information does not make out a Massiah claim.  In Kuhlmann v. Wilson, 477 U.S. 436 (1986), the Supreme Court made clear that the "primary concern of the Massiah line of decisions is secret interrogation by investigatory techniques that are the equivalent of direct police interrogation. . . . '[T]he Sixth Amendment is not violated whenever -- by luck or happenstance -- the State obtains incriminating statements.'"  Id. at 459 (citing United States v. Henry, 447 U.S. 264, 276 (1980)) (Powell, J.,

12

concurring). "[T]he defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." Id. at 459.

In this case, defendant's allegation that the government purposely had Justin Buchanan placed in a cell with defendant in order to elicit incriminating statements is not supported by any evidence. The uncontroverted evidence establishes that (1) Buchanan was never in a cell with defendant[2], and (2) no one associated with the government ever attempted to have Buchanan placed in or near defendant's cell. The evidence establishes that the only agency ever requesting a specific placement with respect to Justin Buchanan was the United States Marshal Service who directed that Buchanan and defendant be kept separate.

Additionally, there is no evidence that Buchanan ever elicited incriminating statements from defendant. No evidence was introduced to establish (1) what statements Buchanan

---

[2]An FBI 302 states that during Justin Buchanan's February 10, 2006, proffer, he said that he talked with defendant in defendant's cell before the COs realized there was a no-contact order. However, this does not establish that the contact occurred when both were in the same cell. The evidence establishes that inmates are able to communicate with each other by yelling from separate cells or by yelling while walking past a cell on the way to the showers. Absent any other evidence, it is a reasonable assumption that the "talking" was done from cell to cell or while on the way to or from the showers. CCA records establish that Buchanan and defendant had not even been in adjacent cells by the time Buchanan gave his proffer in January 2006.

13

allegedly overheard, or (2) what actions or statements Buchanan used to "elicit" incriminating statements from defendant.

### IV. CONCLUSION

Because defendant cannot establish (1) Buchanan was ever in a cell with defendant, (2) that anyone associated with the government ever requested that Buchanan be placed in a cell with defendant, (3) that Buchanan was a "government agent", or (4) that Buchanan deliberately elicited incriminating statements from defendant, he has failed to establish a violation of his Sixth Amendment right to counsel.  Therefore, it is

RECOMMENDED that the court, after an independent review of the pleadings and applicable law, enter an order denying the defendant's motion to suppress the testimony of Justin Buchanan based on a Sixth Amendment violation.

Counsel are advised that, pursuant to 28 U.S.C. § 636(b)(1), each has ten days from the date of receipt of a copy of this report and recommendation to file and serve specific objections unless an extension of time for good cause is obtained.

                                                  /s/ *Robert E. Larsen*
                                                  ROBERT E. LARSEN
                                                  United States Magistrate Judge

Kansas City, Missouri
April 3, 2008